JODI LINKER
Federal Public Defender
Northern District of California
KARTHIK RAJU
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone: (415) 436-7700
Facsimile: (415) 436-7706
Email: Karthik_Raju@fd.org

Counsel for Defendant Jameson

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOHNNY JAMESON,<br><br>Defendant. | **Case No.:** CR 25-146 SI<br><br>**DEFENDANT'S SENTENCING MEMORANDUM**<br><br>**Court:** **Hon. Susan Illston**<br>**Date:** July 31, 2026<br>**Time:** 11:00 a.m. |

## INTRODUCTION

Johnny Jameson asks this Court to sentence him to time served, followed by three years of supervised release. As of July 31, 2026, Mr. Jameson will have spent 411 days in continuous federal custody. PSR ¶ 4. After good conduct credits, that is the practical equivalent of a sentence of approximately sixteen months.[1] It is a substantial sentence, and for this offense of conviction it is a sufficient one.

Mr. Jameson pleaded guilty to two counts of possessing ammunition as a felon, in violation of 18 U.S.C. § 922(g)(1). *Id.* ¶¶ 1-2. Officers never recovered a firearm from him. The reason this case does not read like an ammunition case is that a person died on December 23, 2024, and Mr. Jameson fired the rounds that resulted in his death. Mr. Jameson does not ask the Court to set that aside. A man lost his life, and a family lost him, and Mr. Jameson wishes with everything he has that none of it had happened. What the record shows is that he fired in the course of a sudden fight with an armed man who had a rifle pointed at him. He did what he believed he had to do to survive. That the shooting was justified does not make the loss any smaller.

All parties agree on the Guidelines calculation. Probation initially suggested a cross reference to the voluntary manslaughter guideline, but after both the defense and the government objected, it withdrew that cross reference. With no cross reference, the base offense level is 14 under U.S.S.G. § 2K2.1(a)(6), the total offense level is 12, and the criminal history category is V, producing a range of 27 to 33 months. PSR ¶¶ 3, 17, 25, 38, 94.

Probation nonetheless recommends 42 months, nine months above the top of the range. Sentencing Recommendation at 1. Its stated justification is that "Mr. Jameson used a firearm to kill a person and his dog" and that "the conduct is more egregious given that it involved the loss of two lives." *Id.* at 2-3. That is the same homicide theory Probation abandoned. The Guidelines already contain the mechanism for accounting for a death in a felon-in-possession case. Section

---

[1] Mr. Jameson was arrested on the federal warrant on June 16, 2025 and has remained in continuous custody since. PSR ¶ 4. June 16, 2025 through July 31, 2026 is 411 days. Applying good conduct credit of 54 days per year of the term imposed under 18 U.S.C. § 3624(b), 411 days of actual custody corresponds to a term of approximately sixteen months. Mr. Jameson also spent two days in state custody on the Ramey warrant in January 2025 arising from the same conduct. PSR ¶ 11.

2K2.1(c)(1)(B) directs the Court to the homicide guidelines when the ammunition was used in connection with a killing — but only when that killing was unlawful. A homicide committed in reasonable self-defense is justified, and a justified killing is not an offense the cross reference can reach. Where the shooting and the resulting death are legally justified, they are justified for sentencing purposes too, and what remains to be sentenced is the felon-in-possession conduct and nothing more. Everyone who has examined this record agrees the cross reference does not apply here. An upward variance premised on the same unproven homicide asks the Court to do indirectly what the cross reference does not permit it to do directly.

What the record does establish points the other way. Patrick Riley was armed. Law enforcement recovered an AR-style firearm from the scene, and the San Francisco Police Department Criminalistics Laboratory attributed 85 percent of the DNA on it to Mr. Riley. PSR ¶ 8. Mr. Jameson was a minor contributor at 9 percent, which is what one would expect of a man whose hands were pushing away a loaded rifle held by someone else and pointed at him. *Id.* At the time of this incident, Mr. Riley was out of custody on his own recognizance on a pending charge of assault with a firearm, and he had sustained at least eight arrests and/or convictions for felony assault and firearm and ammunition possession going back to 1997. *Id.*; *See* Ex. A (Page from Search Warrant Aff. of Sgt. John Cunnie at US-000233 (records check revealing "a long criminal history," a 2007 arrest under California Penal Code § 245(a)(2) [Assault with a Firearm] resulting in a conviction under § 246 [Shooting at an Inhabited Dwelling or Vehicle], "numerous prior arrests for unlawful firearm possession and assault related charges," and "pending criminal charges for assault with a firearm (court #24015492) for which he had been released on OR-ACM [Assertive Case Management] on 10/25/24").

None of this is offered to diminish Mr. Riley's life or the loss his family has suffered. It is offered because a sentencing court must know what kind of encounter this was. It was not a robbery or an ambush. It was a sudden fight between two men during which the other man pointed an AR-style rifle at Mr. Jameson. Mr. Jameson admitted in his plea agreement that he fired "believing he was acting in self-defense," and the final report adopts that admission as the factual basis for the plea. PSR ¶ 11. The State arrested Mr. Jameson on a no-bail Ramey warrant on January 15, 2025 and

released him the next day without filing charges. *Id.* No state charge has ever been filed. *Id*. ¶ 40.

The rest of the picture is a man who has already shown this district what he looks like on supervision. Mr. Jameson's prior federal term commenced on January 14, 2022. He graduated from Reentry Court on May 15, 2023, held steady employment for the first time in his adult life, and his supervision was terminated successfully on January 12, 2024, roughly a year before the three-year term would have run. *Id*. ¶ 36. No violation petition was ever filed against him. His one positive drug test, in July 2022, was addressed by his probation officer with a verbal admonishment and no court action. *Id.* Probation itself acknowledges that Mr. Jameson "was able to overcome his drug use while on a previous term of supervised release and was able to maintain stable employment for the first time in his adulthood." *Id*. ¶ 115.

Mr. Jameson is 38 years old. He has been with his partner for 20 years and they have two children together, an 18-year-old son whose high school graduation he missed from custody and a nine-year-old daughter. *Id*. ¶¶ 73, 76. His partner is working as a security guard and carrying the household alone. *Id.* What Mr. Jameson wants out of this case is the chance to go home and help her carry it. He also has an untreated medical problem at Elmwood, described below, that the facility has told Mr. Jameson it does not have the ability to fix.

For the reasons that follow, Mr. Jameson respectfully requests a sentence of time served, three years of supervised release on the conditions Probation recommends, the mandatory $200 special assessment, and no fine.

## **STATEMENT OF REASONS**

Johnny Jameson was born on February 29, 1988 in Oahu, Hawaii, the second youngest of eight children. PSR ¶¶ 70, 71. His father was a pastor, and when Mr. Jameson was about six the family moved to the Bayview district of San Francisco for his father's ministry. *Id*. ¶ 71. He remembers the move as a culture shock. *Id.* He otherwise describes a good childhood, played bass in his father's church, and reports no history of abuse in the home. *Id.*

That childhood ended abruptly. When Mr. Jameson was about 15, his father died of diabetes. His mother died of the same disease a year later. PSR ¶ 72. He watched both parents lose pieces of themselves first, his father a toe and his mother her legs and much of her vision. *Id.* He was in

juvenile hall when his mother died and was permitted to attend her funeral. *Id.* He was 16, orphaned, and moving between relatives in San Jose and older brothers in San Francisco. *Id.* He had started drinking at 11 and smoking marijuana at 12. He first used methamphetamine at 14, the year before his father died, and was a daily user by 18. *Id.* ¶ 81.

Nearly everything in Mr. Jameson's criminal history follows from that. His prior record is a 20-year loop of drug use, property crime, and modest custodial terms. It is not the record of an organized or predatory offender. It is the record of an untreated addict from a poor neighborhood who was a child when the adults in his life died. His criminal history category of V rests on eleven points, and three of those eleven come from two misdemeanors, a false identification to a peace officer and simple possession of a controlled substance. *Id.* ¶¶ 33, 35, 38.

The one stretch of his adult life when the loop broke is the most instructive part of this record. After his 2020 federal firearms sentence, Mr. Jameson came out to supervision in January 2022 and did the work. He entered this district's Reentry Court and graduated in May 2023. *Id.* ¶ 36. He held three jobs in succession, cleaning streets in the Tenderloin for Civic Pit Stop, then freeway cleanup through the Conservation Corporation, then Motivate LLC, where he drove around San Francisco changing batteries on bike-share bicycles at $22.50 an hour. *Id.* ¶¶ 85-87. He stayed sober, and he remained sober because he was on a Suboxone prescription. *Id.* ¶ 82. His supervision was terminated successfully in January 2024. *Id.* ¶ 36. When he could no longer afford the medication he stopped taking it, and he went back to methamphetamine. *Id.* Within a year he was on Selby Street in the middle of a relapse. That sequence is not an excuse. It is a treatment problem with an identified cause and an identified fix, and it is exactly the kind of problem supervised release manages well.

Mr. Jameson's family has stayed with him through all of it. He and his partner have been together for 20 years, and she verified his history for Probation and continues to support him. *Id.* ¶¶ 73, 76. Their son turned eighteen this year and their daughter is nine. *Id.* ¶ 73. Before this arrest, Mr. Jameson was the quintessential parent at the sports fields. He was heavily involved in his children's extracurricular activities, and he describes missing his son's graduation as the thing he is most ashamed of in this case. *Id.* His daughter had an unexplained seizure in 2022 that sent her through a battery of neurological testing. *Id.* ¶ 74. He speaks with his family every day from custody and they

have visited him at the jail. *Id*. ¶ 73. What he says he wants is unglamorous and verifiable. He wants to leave the Bayview and Hunter's Point, find a good-paying job, and be present for his daughter the way he was for a while. *Id*. ¶ 75.

Mr. Jameson has the tools to do it. He earned his GED in 2005, attended Heald College briefly, and has specialized training in carpentry and the installation of metal door frames, along with a forklift license. *Id*. ¶¶ 83, 84. Boyett Construction, where he worked as a carpenter apprentice, told Probation it would consider re-employing him. *Id* ¶ 89. He has been prescribed medication for depression since 2019 or 2020 and finds it helpful, and he has met with a counselor monthly throughout this incarceration. *Id* ¶ 79. He has asked on his own initiative to continue mental health counseling and to participate in substance abuse treatment on supervision. *Id* ¶¶ 79, 82.

Finally, and urgently, Mr. Jameson has a medical problem at the Elmwood Correctional Facility that the facility has told him, despite counsel's efforts, that it cannot solve. Mr. Jameson has full upper and lower implant-supported dentures. They are not removable appliances. They are prosthetic teeth anchored to implants screwed into his jaw, and they required significant oral surgery to place. Approximately three weeks ago they loosened. He cannot speak easily, and he cannot chew properly. Counsel contacted the facility, and Mr. Jameson was seen by the jail dentist, who advised that he does not have the equipment or the training to repair implant-supported dentures and that the only step available to him is to take them out. Removal would leave Mr. Jameson unable to eat solid food and barely able to make himself understood, and it would undo the surgery that put them there. He is serving this sentence in avoidable discomfort, on a compromised diet, and without the ability to communicate normally. That is a condition of confinement the Court may properly weigh under 18 U.S.C. § 3553(a)(2)(D), and it is one that can be corrected the day he is released and can see an oral surgeon in the community.

## ARGUMENT

### A. The offense of conviction is possession of ammunition, and the Guidelines have already accounted for the shooting.

The range of 27 to 33 months already reflects everything the Court can properly find on this record. Section 2K2.1 contains its own mechanism for the case in which a felon's ammunition is used

in connection with another offense where someone dies. That mechanism is the cross reference at § 2K2.1(c)(1)(B), and it applies only if the proponent proves every element of the substituted offense, including the absence of a justification that would make the killing lawful. *See United States v. Lucas*, 101 F.4th 1158, 1163 (9th Cir. 2024) (en banc); *United States v. Evans*, 883 F.3d 1154, 1159 (9th Cir. 2018) (where the § 2K2.1(c) cross reference turns on self-defense, "the government's burden was to disprove self-defense by a preponderance of the evidence").

No one has met that burden, and no one claims to have met it. The Government and Probation agree the cross reference is unsupported and does not apply. The final report contains no finding that the killing was unlawful, because there are no facts from which such a finding could be drawn. The only percipient account in the report comes from Mr. Riley's partner, who had grabbed one of the dogs and walked away, and who heard the shots without seeing them. PSR ¶ 7. The report establishes that Mr. Riley was shot and died. It does not establish what led up to the incident, and it affirmatively records that Mr. Riley possessed the firearm recovered at the scene. *Id.* ¶¶ 7-8.

An upward variance premised on an unlawful killing rests on that same empty record. A sentencing court may consider uncharged conduct, but it must still find the conduct by a preponderance of the evidence. Where the government affirmatively declines to assert that the standard is met, where Probation has withdrawn the calculation that depended on it, and where the State reviewed this shooting and filed nothing, there is no factual basis for a nine-month upward variance premised on a resulting death when there is insufficient evidence to disprove a justification of self-defense. The Court should sentence Mr. Jameson for what the record supports, which is that he was a felon in possession of ammunition.

**B. The circumstances of the possession are genuinely unusual and cut in Mr. Jameson's favor.**

This must be said plainly. A man died in that fight, and that is a tragedy. Mr. Jameson does not minimize it, and neither does this memorandum. He wishes with everything he has that none of it had happened. Patrick Riley had a partner, and children, and a family that lost him, and Mr. Jameson genuinely feels for them. He has never tried to celebrate what he did or to pretend it away. What he has said, from the beginning, is that in the moment he was in — grappling with a man who had a rifle

— he did what he believed he had to do to survive. Both of those things are true at once: the death is a grave loss, and the shooting was an act of self-defense. Acknowledging the first does not diminish the second. And Mr. Jameson also has no illusions about his own conduct. He had ammunition he was not permitted to have. He fled the scene and abandoned the car. PSR ¶¶ 9, 81. He told Probation, without hedging, "I feel stupid for having ammunition. I accept responsibility. I'm sorry." *Id.* ¶ 14.

Most § 922(g) cases involve a defendant who armed himself for a purpose. This record shows something different. Mr. Jameson and Mr. Riley had been together for about an hour before anything happened. One of Mr. Riley's two pit bulls bit Mr. Jameson on the lower leg. An argument ensued, it turned physical, and at some point in that struggle Mr. Riley pointed his AR-style firearm at Mr. Jameson, who had not displayed any weapon before that point. Mr. Jameson pushed the gun away and acted in self-defense.

The man Mr. Jameson was grappling with was, at that moment, a person released on his own recognizance on a pending charge of assault with a firearm, with a decades-long history of arrests and convictions for felony assault and unlawful firearm possession. PSR ¶ 8; Ex. A at US-000233. Mr. Jameson had no way of knowing any of that, and he does not offer it as an excuse. He offers it because the government's own sworn filings place the rifle in that struggle in the hands of a man with a documented history of armed violence, and because a court assessing danger to the community under § 3553(a)(2)(C) should know the difference between a defendant who went looking for a confrontation and one who found himself in the middle of one.

**C. Mr. Jameson's prior performance on federal supervision is the best available predictor of what supervision will do here.**

The most reliable evidence in this record about Mr. Jameson's future is his own past on supervision, and it is good. He served a 30-month federal sentence and came out to a three-year term in January 2022. *Id.* ¶ 36. Over the next two years he was never the subject of a violation petition. He completed Reentry Court. He worked continuously. His supervision was terminated successfully in January 2024, roughly a year early. *Id.* His single positive drug test in July 2022 was handled by his probation officer with a verbal admonishment and required no court action. *Id.*

Probation unfortunately reads that history as a failed deterrent, concluding that Mr. Jameson's

"criminal behavior has only escalated and has not been deterred by prior lengthy sentences." Sentencing Recommendation at 2. The record does not support that reading. Between his release in 2022 and his arrest in this case, Mr. Jameson sustained no new convictions and, in Probation's own words, "appeared to have been leading a law-abiding life." *Id.* What ended that period was not indifference to the law. It was the loss of a Suboxone prescription he could not afford. *Id.* ¶ 82. Additional years in prison do not address that. A term of supervised release with medication-assisted treatment, testing, and mental health care does, and Mr. Jameson has already shown that he responds to exactly that structure.

**D. Mr. Jameson has shown he can thrive under supervision, and he will again.**

Mr. Jameson's request is a downward variance. The justification for it is the combination of circumstances set out above, which is not the ordinary § 922(g) profile. He was in a mutual physical struggle with an armed man. The State investigated and filed nothing.

A family that has stayed with him for 20 years is waiting for him and needs his income. Time served, at roughly the equivalent of a 16-month sentence, followed by supervision, is sufficient but not greater than necessary here. He asks for the full three years, with the conditions Probation proposes, including mental health assessment and treatment, substance abuse testing and treatment, the employment condition, and the search condition the parties agreed to in the plea agreement. Sentencing Recommendation at 4-5. He has asked for continued mental health counseling on his own. PSR ¶ 79. He needs a stable medication regimen for his depression, restored medication-assisted treatment for his substance use disorder, and an oral surgeon. He also needs to get out of the neighborhood he has been cycling through since he was six years old, and he has told Probation that is his plan. *Id.* ¶ 75. The probation office in this district has helped him do this before and can do it again.

**E. Mr. Jameson has a home, a plan, and a family waiting for him.**

The people who know Johnny Jameson best have written to the Court, and their attached letters describe the same man Probation's own record describes: someone who does the work when he is given the chance. *See* Ex. B (Letters from his Partner, Brother, Sister and Son). His partner of nearly 20 years, Dazy Afalava, writes not to excuse what brought him here but to ask the Court to see "the

whole person standing before you—not only the choices that brought Johnny here, but also the loving father, hardworking provider, and caring man that our family has known for nearly twenty years." *Id*. She is careful and clear-eyed. She describes Mr. Jameson as a man "who accepts responsibility for his actions, and who genuinely wants to become a better father, partner, and person," and she says plainly that his difficult childhood does "not excuse the choices he has made." *Id*. What she has watched in the 14 months of his incarceration is the reason she still believes in him. "During his incarceration," she writes, "I have seen Johnny become more thoughtful about his life. He has taken parenting classes, spent time reading the Bible, and reflected deeply on the kind of father and man he wants to be." *Id*. That is not the account of a partner minimizing an offense. It is the account of a woman who has "watched Johnny overcome difficult circumstances before" and who is telling the Court what she has seen with her own eyes this time. *Id*.

Every one of these letters points forward rather than back. Ms. Afalava writes that "when Johnny is released, he has a plan to work, rebuild his life, and continue being the father our children need," and that "he has a strong support system through our family and people who believe in him." *Id*. His absence has fallen hardest on those children—she notes that their daughter "still cries because she misses her dad," and that Mr. Jameson missed their son's high school graduation and eighteenth birthday, "milestones that can never be replaced." *Id*. His sister Corazon asks the Court to give her brother "the opportunity to return home to his wife and two children" and "the chance to rebuild his life, continue growing as a person, and be present for his family," describing the brother she was raised alongside as "someone with a good heart who cares deeply about his family." *Id*. His older brother James, writing from Anchorage, makes no excuses either—he states that "Johnny regrets his actions"—but says he knows "deep in my heart Johnny could make a change for the good of his children and himself." *Id*.

What these letters ask the Court to credit is not that Mr. Jameson is without fault, but that he has a family ready to receive him, a plan to go to work, and, in the words of the person who has stood beside him for two decades, a real and observable determination "to continue becoming the father, partner, and man he is capable of being." *Id*.

## CONCLUSION

For the reasons stated above, a sentence of time served, the equivalent of a sixteen month sentence, followed by three years of supervised release, holds Mr. Jameson accountable for the offense he actually committed, reflects the unusual circumstances in which he committed it, and puts him where this record shows he does best, which is under supervision, in treatment, and with his family.

Dated: July 24, 2026

Respectfully submitted,

JODI LINKER
Federal Public Defender
Northern District of California

_/s/____________________

Karthik Raju
Assistant Federal Public Defender